**BRASSELER, U.S.A. I, L.P.,**
**Plaintiff–Appellant,**

v.

**STRYKER SALES CORPORATION**
**and Stryker Corporation,**
**Defendants–Appellees.**

**No. 00–1194.**

United States Court of Appeals,
Federal Circuit.

DECIDED: Oct. 9, 2001.

Edward E. Vassallo, Fitzpatrick, Cella, Harper & Shinto, of New York, NY, argued for plaintiff-appellant.

Gregory J. Vogler, McAndrews Held & Malloy, Ltd., of Chicago, Illinois, argued for defendants-appellees. With him on the brief were Timothy J. Malloy, Geoffrey A. Baker, and James R. Nuttall. Of counsel

on the brief were Paul W. Painter, Jr., Ellis, Painter, Ratterree & Bart LLP, of Savannah, GA; and Alexander J. Simmons, Schreeder, Wheeler & Flint, LLP, of Atlanta, GA.

Before CLEVENGER, Circuit Judge, PLAGER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

## DECISION

GAJARSA, Circuit Judge.

Brasseler, U.S.A. I, L.P. ("Brasseler") appeals from a grant of a motion for attorney fees by the United States District Court for the Southern District of Georgia awarding attorney fees in accordance with 35 U.S.C. § 285. *Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.*, 93 F.Supp.2d 1255 (S.D.Ga.1999) (*"Brasseler III"*). For the reasons discussed below, we affirm the judgment of the district court.

## BACKGROUND

Brasseler markets medical instruments through an unincorporated division, Komet Medical. In May 1991, Alex Miller, Brasseler's national sales director, contacted Robert L. Stranahan, the sole owner of DS Manufacturing ("DSM"), a saw blade manufacturer, to assist in the development of a new surgical saw blade. In exchange for his assistance, Brasseler promised to purchase the blades exclusively from DSM. Miller and Stranahan, with the assistance of an employee from each company, created a design for a surgical saw blade that later became known as the K–2000 blade. In accordance with their agreement, DSM was to manufacture the newly designed blades for sale to Brasseler. Brasseler would then mark, package and sterilize the blades for resale under an FDA license authorizing it to make such sales.

On April 13, 1992, DSM sold over 3,250 of the K–2000 blades to Brasseler for approximately $27,000.00. Twelve months later Brasseler instructed its attorney to prepare and file a patent application. On April 27, 1993, Christopher W. Brody, an associate with the law firm representing Brasseler, apparently was instructed by Robert L. Price, his supervising attorney, to prepare a patent application covering the K–2000 blade. Brody was instructed to file the application by April 30, 1993, to avoid "a potential on-sale bar of May, 1992." During the two days Brody spent preparing the application he made no inquiry about the details of the sale. The application was filed on April 30, 1993, and issued on April 26, 1994, as U.S. Patent No. 5,306,285 ("the '285 patent"). Neither Price nor Brody ever conducted an investigation into the facts surrounding the potential May on-sale bar, and Brody claimed not to have learned of the April 13, 1992 sale, or any event which might have given rise to the rushed filing, until the sale became an issue in the initial proceeding before the district court.

Brasseler filed suit against Stryker Corporation ("Stryker") for infringement of the '285 patent. *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, No. CV 497–184 (S.D. Ga. June 25, 1998) (memorandum order) (*"Brasseler I"*). Stryker raised an on-sale bar defense, claiming that the patent was invalid because the inventors sold the patented blades more than one year before Brasseler filed its patent application, in violation of 35 U.S.C. § 102(b). Brasseler insisted that no invalidating sale occurred, arguing that the blades were not within the scope of the claims because they required additional processing. Brasseler further argued that because the sale took place between companies owned by or employing the individual inventors, the sale did not qualify as one giving rise to a statutory on-sale bar.

The district court determined that the transaction constituted a sale in accordance with the statute and granted Stryker's motion for summary judgment on this issue. This court affirmed that determination. *Brasseler U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 51 USPQ2d 1470 (Fed.Cir.1999) ("*Brasseler II*"). In *Brasseler II*, although we noted that the Supreme Court had enunciated a new two part test for establishing criteria for determining whether an offer for sale or a sale will give rise to a statutory bar in *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), our holding did not turn on the new test. The determinative holding in *Brasseler II* was premised on the finding that there had been a sale between two unrelated corporate entities and the case did not involve a mere offer for sale. On appeal, Brasseler had requested the court to adopt a "joint development" exception to the on-sale bar rule, a proposition that this court had never before recognized. We rejected Brasseler's argument that sales between joint inventors escape the reach of the on-sale bar because this court had previously recognized that a sale between separate and distinct legal entities qualifies as a sale under the statutory bar even where there is an overlap of ownership between the buyer and seller, citing *In re Caveney*, 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir. 1985). *See Brasseler II*, 182 F.3d at 890, 51 USPQ2d at 1471. Thus, before the events that produced this litigation, patent lawyers knew that no "joint development" exception existed in the on-sale bar law. In *Brasseler II*, therefore, we concluded that the sale gave rise to a bar because it was a sale between two distinctly separate corporate entities with no common ownership or control. In that case, we also determined that the sale involved products embodying the claimed invention, finding that the processing step, alleged by Bras-

seler to distinguish the blades as sold from those claimed, was not a component of the claims. *Id.* at 891, 51 USPQ2d at 1473. In *Brasseler II*, we further noted that, "[b]y way of the sale to Brasseler, these inventors commercially exploited the invention prior to the critical date." *Id.* at 891, 51 USPQ2d at 1472. The case was remanded to the district court for a determination of whether this was an exceptional case entitling Stryker to attorney fees in accordance with 35 U.S.C. § 285. *Id.* at 892, 51 USPQ2d at 1474.

On remand, Stryker argued before the district court that it was entitled to attorney fees because Brasseler had breached its duty of candor and disclosure to the Patent and Trademark Office ("PTO") by: (1) unreasonably failing to investigate the sale of the invention; (2) applying for a patent without disclosing the "on-sale" facts; and (3) unjustifiably suing Stryker despite knowledge of the patent's invalidity. *Brasseler III*, 93 F.Supp.2d at 1257.

The district court noted that to prove inequitable conduct, in accordance with *FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 5 USPQ2d 1112 (Fed.Cir.1987), one alleging "failure to disclose" type inequitable conduct must prove with sufficient clarity that: (1) information exists that is material; (2) the applicant or his or her attorney knew of this information and that it was material; and (3) the applicant or his or her attorney failed to disclose the information with the intent to mislead the PTO. *Brasseler III*, 93 F.Supp.2d at 1259.

Focusing on the third element in the inequitable conduct analysis, the district court noted that the degree of intent to mislead necessary to trigger culpability varies in proportion to the materiality of the information. *Id.* Next, the district court noted that in *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 43 USPQ2d 1666 (Fed.Cir.1997), this

circuit had emphasized that depending on the facts of each particular case, intent may be inferred where a patent applicant knew, or should have known, that withheld information could be material to the PTO's consideration of the patent application. *Brasseler III*, 93 F.Supp.2d at 1260. The district court noted that in *Critikon*, 120 F.3d at 1256–57, 43 USPQ2d at 1668–69, this court found a patentee's failure to appreciate the legal significance of the facts that it failed to disclose did not absolve it of its duty to disclose. *Brasseler III*, 93 F.Supp.2d at 1260. Accordingly, the district court concluded that Brasseler is charged with its attorney's knowledge of the law. *Id.* At the same time, the district court noted that mere negligence, or even gross negligence, cannot lead to a finding of deceptive intent. *Id.* at 1258–59.

Reviewing the circumstances surrounding the sale and the prosecution of the application, the district court recognized that the failures were more than gross negligence holding that "[t]he 'sum total of [Brasseler's] conduct,' demonstrates § 285–level intent to defraud the PTO." *Id.* Based on the conduct of both the inventors and their representatives, the court deemed this case "exceptional," entitling Stryker to attorney fees. Price and Brody had notice that a potential on-sale bar event had occurred, but did not know what the event was or the exact date the event took place. The court determined that, having received notice that a potential bar existed, Brasseler's attorneys were obligated to conduct an investigation into the facts surrounding the sale and to disclose any information reasonably believed to be material. *Id.* at 1260–61. The court found Price and Brody's failure to investigate, at any time prior to issuance of the patent,

the potential bar of which they were aware and that had generated such concern amongst the inventors, constituted sufficient evidence of inequitable conduct.

Specifically, Brody testified that there was insufficient time for him to conduct an investigation into the facts surrounding the "potential bar" in the course of preparing the application. However, he did not conduct any investigation even after the application had been filed. He argued only that it was reasonable for him to assume that the invalidating event must have occurred some time in May 1992, because Price [1] advised him that he must file the patent application by April 30, 1993 to avoid "a potential on-sale bar of May, 1992."

After hearing the evidence presented and drawing pertinent inferences from that evidence, the district court concluded that the alleged May 1992 on-sale bar date had no basis in fact and instead had been concocted by Price simply to set a deadline for Brody's preparation of the application. The district court found that someone from Brasseler, or someone on its behalf, contacted Price to prepare the patent application. The district court also found that the April 13 sale was the event that prompted either Brasseler or the "someone" to contact Price, who "decided to get the patent application quickly filed and hope for the best. So, he simply gave Brody a deadline, and Brody evidently picked up on the problem, as evidenced by his studied refusal to make even the most basic inquiries. . . ." *Id.* at 1263.

The sum of the evidence thus led the district court to conclude that both Price and Brody knew that prior to May 1992 there was a potential on-sale bar event

---

1. Brody offered conflicting testimony at his deposition regarding this matter, first stating that Price instructed him to rush the filing of the application, then stating that it was the client who told him to file it so quickly.

that could prevent issuance of the patent, that Price created a fictitious on-sale deadline, and that the attorneys pursued a "studied refusal" to ascertain the precise on-sale bar date, even though the client had tipped them off to the existence of the problem.

In light of evidence suggesting that Price and Brody believed an invalidating event had occurred, and particularly the fact that at no time after filing did either attorney inquire as to the date or the event that so concerned the inventors, the district court rejected Brasseler's argument that Price and Brody were excused from inquiring into the details of the event. The court found incredible Price and Brody's failure to take "ten minutes to verify basic filing-deadline information." *Id.* at 1261. The court was further influenced by Brasseler's decision not to obtain any testimony from Price showing that he had a reasonable basis for failing to direct or make such an inquiry and its invocation of the attorney-client privilege to protect documents generated by Brody in the course of prosecuting the application. The court noted with great skepticism that Brasseler even failed to provide evidence explaining who at Brasseler contacted Price and what event prompted the rushed filing of the application. The court further noted that Brody was in direct contact with the inventors in the course of preparing the application, particularly while preparing the post-filing inventor's declaration, yet he could not recall having discussed any potential bar events.

The district court found Brody's responses lacking in candor, stating that in response to questions surrounding who instructed him to file the application, whether he knew what the event was that presumably gave rise to a bar, and why he did not know the date the event took place, "[h]e tiptoes around" the truth. *Id.* at

1262. The court concluded that Brody did not conduct a post-filing investigation because he was reluctant to learn the specific facts pertaining to earlier sales that he would have been obliged to disclose to the PTO. The court also found Brody's refusal to do so underscored the "studied ignorance that he carefully cultivated" and with which he prosecuted the application. *Id.* at 1262–63. The court also referred to the "high-spun wordplay" Brody employed in the course of this litigation in an attempt to diminish the implications arising from his conduct. *Id.*

On the basis of the evasive testimony of Brody, the suspicious circumstances surrounding the rush filing of the application, the interactions between the inventors and their attorneys, and the absence of testimony from supervisory attorney Price to suggest that the failure to investigate the details surrounding the bar event was not committed in bad faith, the court concluded that the attorneys possessed the requisite intent to support a finding of inequitable conduct. The district court concluded that someone from Brasseler who knew of the April 13, 1992 sale, "sensing it was too late," nevertheless contacted Price and instructed him to rush the filing of the application. *Id.* at 1261. Price "evidently decided to get the patent application quickly filed and hope for the best." *Id.* at 1263. Price gave Brody a false deadline and, given the circumstances, "Brody evidently picked upon on the problem" yet failed to apprise himself of the specific details of the event which constituted an on-sale bar. *Id.* at 1261, 1263. Based on "patent counsel's studied refusal to timely investigate" and failure to disclose information under a continuing duty, the district court determined that Brasseler had acted with deceptive intent. *Id.* at 1263–64.

The district court further found that the conduct of the inventors contributed to its

determination that Brasseler had committed inequitable conduct. The court noted that Stranahan, a named inventor, had filed both an oath and a post-application inventor's declaration, wherein he acknowledged being under a duty to disclose. The court further noted that the inventors, who also happened to be corporate executives of the companies and were therefore involved in the sale, had been in contact with counsel throughout prosecution. Thus, the court found Stranahan chargeable with knowledge of the sale and its materiality, and that under *Critikon* he had a duty to inform the PTO of the sale. The court held that, at a minimum, Stranahan should have informed his patent attorney of the sale. *Id.* at 1263. In addition, the court held that "inventors cannot 'empty-head' their own patent counsel, and patent counsel cannot shirk basic, § 102(b) factual inquiry requirements," which arise at the time of filing and continue throughout the prosecution. *Id.* at 1264.

Brasseler unsuccessfully urged the district court to find that it did not possess the requisite intent to deceive because it reasonably believed that sales between joint inventors would not give rise to a bar and, therefore, reasonably believed this sale was not material. The district court rejected that argument, finding that under the precedent of this court the transaction was a commercial sale requiring disclosure and that no joint venture exception to the on-sale bar rule existed.

Brasseler further argued that an award of attorney fees is not justified in this case because its decision not to disclose the sale was a reasonable interpretation of the applicable law in existence at the time the application was filed. Specifically, Brasseler points to the fact that the Federal Circuit's on-sale bar determination in *Brasseler II* was based on the recently issued decision in *Pfaff v. Wells Elecs.,*

*Inc.,* 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), in which the Supreme Court resolved the confusion surrounding the application of the "totality of the circumstances" test for determining whether a transaction would give rise to a bar and replaced that test with a new two part analysis. Alternatively, Brasseler argued that under the "totality of the circumstances" test it reasonably believed it was not required to disclose the sale to the PTO. Rejecting both contentions, the district court concluded that the high materiality of the sale was readily apparent under either standard.

The district court further refused to limit its award of fees to those Stryker incurred in raising the on-sale bar defense. Indeed, the district court noted that Brasseler did not show that Stryker's alternative defenses were legally frivolous. Thus, the court determined that Stryker should recover expenses incurred in the course of developing these alternative defenses.

The district court entered judgment granting Stryker's motion for an award of attorney fees in the amount requested by Stryker. *Brasseler III,* 93 F.Supp.2d at 1265. Brasseler appeals that decision. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1)(1994).

## STANDARD OF REVIEW

Whether a case is "exceptional," in accordance with 35 U.S.C. § 285, is a question of fact. *Slimfold Mfg. Co., Inc. v. Kinkead Indus., Inc.,* 932 F.2d 1453, 1459, 18 USPQ2d 1842, 1847 (Fed.Cir.1991). We review *de novo* whether the district court applied the proper legal standard under 35 U.S.C. § 285, and we review the court's factual findings, including whether the case is exceptional, for clear error. *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1186, 33 USPQ2d 1823, 1833 (Fed.Cir. 1995). Direct or circumstantial evidence

that is clear and convincing is needed to establish an "exceptional case." *Eltech Sys. Corp. v. PPG Indus., Inc.,* 903 F.2d 805, 810–11, 14 USPQ2d 1965, 1969–71 (Fed.Cir.1990). On motion for attorney fees, if the district court applied the correct legal standard and did not clearly err in its factual findings, then we review the court's decision whether or not to award attorney fees for abuse of discretion. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1178 (Fed. Cir.1998) (en banc).

▮ Inequitable conduct is an equitable issue committed to the discretion of the trial court and is, therefore, reviewed by this court under an abuse of discretion standard. *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876, 9 USPQ2d 1384, 1392 (Fed.Cir.1988) (en banc in relevant part). We will not substitute our judgment for that of the trial court in relation to the discretionary ruling of inequitable conduct unless the appellant establishes that the ruling is based upon clearly erroneous findings of fact or a misapplication or misinterpretation of applicable law or that the ruling evidences a clear error of judgment on the part of the district court. *Id.*

▮ Determination of inequitable conduct, for establishing that a patent is unenforceable, requires a two-step analysis. First, the trial court must determine whether the withheld information meets a threshold level of materiality. *Halliburton Co. v. Schlumberger Tech. Corp.,* 925 F.2d 1435, 1439, 17 USPQ2d 1834, 1838 (Fed.Cir.1991). Second, the district court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO. *Id.* Except when reviewed on grant or denial of a motion for summary judgment of unenforceability of . the disputed patent or patents, these factual determinations are generally reviewed

by this court under the clearly erroneous standard of review. *Kingsdown,* 863 F.2d at 876, 9 USPQ2d at 1392 (en banc in relevant part). We review the district court's ultimate determination of inequitable conduct under an abuse of discretion standard. *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1327, 47 USPQ2d 1225, 1228–29 (Fed.Cir.1998); *Kolmes v. World Fibers Corp.,* 107 F.3d 1534, 1541, 41 USPQ2d 1829, 1834 (Fed.Cir.1997).

## DISCUSSION

▮ On appeal, Brasseler argues that no evidence supports the factual findings underlying the district court's conclusion that Stryker is entitled to an award of attorney fees because this is an exceptional case in which the inventors possessed the requisite intent to be charged with inequitable conduct. Accordingly, Brasseler urges that the district court's award of attorney fees must be reversed.

Brasseler asks this court to reverse the district court's findings that the inventors understood the materiality of the April 13, 1992 sale and withheld the existence of the sale from the PTO with the intent to deceive. Specifically, Brasseler argues that the inventors' failure to disclose the existence of the sale to their patent attorneys precluded such a finding. It maintains that, as a result, the inventors could not have appreciated that the sale might give rise to a statutory bar and, therefore, failed to understand that they were under a duty to disclose this information to the PTO.

Brasseler further urges us to reverse the district court's finding that Price and Brody, Brasseler's patent attorneys, committed inequitable conduct. In particular, Brasseler argues that Price and Brody could not have known that the sale was material and could not have possessed the requisite intent to deceive because the in-

ventors had failed to apprise them of the specific sale.

■ Thus, Brasseler asks this court to find, on one hand, that the inventors' failure to disclose the sale to its representatives absolves the inventors of their duty to disclose the sale to the PTO because they could not have known—absent their attorneys' assistance—that the sale was material. On the other hand, Brasseler maintains that its counsels' failure to investigate the facts surrounding the potential bar is excused on the basis that the inventors failed to fully inform them of the details of the sale. We refuse to pursue the circular logic of Brasseler's request and decline to carve out an exception to the inequitable conduct law to shield those guilty of inequitable conduct from responsibility for their actions.[2] In view of the evidence before the district court that the inventors and their attorneys acted in bad faith, and the lack of evidence that they acted in good faith, we find no reason to disturb the district court's conclusions in this matter.

■ A district court may award reasonable attorney fees to the prevailing party in a patent infringement case where the conduct of a party is deemed to be "exceptional." 35 U.S.C. § 285. Exceptional cases are normally those involving bad faith litigation or those involving inequitable conduct by the patentee in procuring the patent. *Cambridge Prods. Ltd. v. Penn Nutrients Inc.*, 962 F.2d 1048, 1050–51, 22 USPQ2d 1577, 1579–80 (Fed.Cir. 1992). The prevailing party may prove the existence of an exceptional case by showing: inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a

frivolous suit or willful infringement. *Hoffmann–La Roche Inc. v. Invamed Inc.*, 213 F.3d 1359, 1365, 54 USPQ2d 1846, 1850 (Fed.Cir.2000). Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees, and may suffice, by themselves, to make a case exceptional. *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574, 38 USPQ2d 1551, 1557–58 (Fed.Cir.1996).

■ As previously noted, to reach a finding of inequitable conduct, the district court must determine that information known to the inventors or their representatives was both material and intentionally withheld. *FMC Corp. v. Manitowoc Co.*, 835 F.2d at 1415, 5 USPQ2d at 1116 (Fed. Cir.1987). Information is deemed material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed.Cir.1984). To avoid a finding of inequitable conduct, doubts concerning whether information is material should be resolved in favor of disclosure. *Critikon*, 120 F.3d at 1257, 43 USPQ2d at 1669. Where an applicant knows of information the materiality of which may so readily be determined, he or she cannot intentionally avoid learning of its materiality, even through gross negligence; in such cases the district court may find that the applicant should have known of the materiality of the information. *Id.*; *Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397, 38 USPQ2d 1593, 1595 (Fed.Cir. 1996) (quoting *FMC Corp. v. Manitowoc Co.*, 835 F.2d at 1415, 5 USPQ2d at 1116).

■ Typically, a finding of inequitable conduct hinges on whether the evidence as

---

**2.** In accordance with 37 C.F.R. § 1.56, inventors and their representatives are under a duty to disclose all material information known to them. *Molins*, 48 F.3d at 1178, 33 USPQ2d at 1826.

a whole indicates that patentees or their representatives acted with the intent to deceive. *See, e.g., Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1582, 19 USPQ2d 1241, 1250 (Fed.Cir.1991). When balanced against high materiality, the showing of intent can be proportionally less. *N.V. Akzo v. E.I. DuPont de Nemours,* 810 F.2d 1148, 1153, 1 USPQ2d 1704, 1708 (Fed.Cir.1987). In *Monon Corp. v. Stoughton Trailers Inc.,* 239 F.3d 1253, 57 USPQ2d 1699 (Fed.Cir.2001), we recently reiterated that a district court's credibility determinations on intent to deceive the PTO "can virtually never be clear error." *Id.* at 1263–64, 57 USPQ2d at 1707.

The district court determined that the inventors and their representatives were sufficiently aware of the existence of the sale, knew or should have known that the transaction was material, and intentionally withheld that information from the PTO on the basis that it might act as a bar. Brasseler challenges only the underlying factual basis for the court's determination that this is an "exceptional case," the district court's finding of materiality and intent. Thus, our analysis is limited to a review of those two issues.

*The Conduct of the Attorneys*

Brasseler asks this court to review the district court's findings, on motion for attorney fees, that Price and Brody failed to disclose material information on the basis that they knew that specific, potentially material, information existed, and that they willfully chose to ignore it in an effort to avoid compliance with their duty to disclose such information.

▮▮▮▮ The district court is charged with the determination of whether a party's conduct is exceptional and whether fees should be awarded. 35 U.S.C. § 285 (1994) ("The court in exceptional cases may award reasonable attorney fees to the prevailing party."); *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1380, 52 USPQ2d 1129, 1142 (Fed.Cir.1999); *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1190, 25 USPQ2d 1561, 1568 (Fed.Cir.1993) ("[T]he decision respecting inequitable conduct is a discretionary decision to be made by the judge on his or her own factual findings."). "A summary judgment that a reputable attorney has been guilty of inequitable conduct, over his denials, ought to be, and can properly be, rare indeed." *Burlington Indus., Inc. v. Dayco Corp.,* 849 F.2d 1418, 1422, 7 USPQ2d 1158, 1161 (Fed.Cir.1988). Thus,

[a]lthough the premises of inequitable conduct require findings based on all the evidence, a procedure that may preclude summary determination, *see KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571, 1577, 228 USPQ 32, 35 (Fed. Cir.1985), a motion for summary judgment may be granted when, drawing all reasonable factual inferences in favor of the non-movant, the evidence is such that the non-movant can not prevail.

*ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 547, 48 USPQ2d 1321, 1330 (Fed.Cir.1998). With those principles in mind, we conclude that, given the attorneys' knowledge of a potential on-sale bar, the lack of any rational basis to support the alleged "May 1992" bar date and the absence of any credible evidence about or explanation for Price and Brody's failure to investigate the details of the bar at any time before or after the application was filed, the district court properly concluded that this case was amenable to summary judgment and that the facts presented before it were indeed exceptional. We note and emphasize that this is not a case where the attorneys made a reasoned judgment on the law and the facts. Reasoned judgments based upon all of the known facts of course can give rise to a defense of good

faith, which could be sufficient to overcome the determination of exceptionality. Such is not the case here.

The facts before the district court regarding Price and Brody's knowledge and conduct were that: (1) Price was contacted by someone at Brasseler who told him that a potentially barring event took place, (2) either Price or one of the inventors told Brody that an unknown event occurred sometime in May of the previous year which might give rise to a bar, (3) Brody was instructed to file the application within three days, which he recognized to be an extremely short period of time in which to file an application, (4) although Brody was in direct contact with an inventor who happened also to be the owner of one of the corporations involved in the transaction, Brody never asked the inventor for the details surrounding the event which gave rise to the extremely rushed filing, (5) Price sought to extricate himself from the problems by creating a fictitious on-sale bar date and leaving Brody to prepare a patent application for filing before that date, and (6) both Price and Brody were unaware of a specific event which might give rise to a bar, and failed, even after the application was initially filed, to ever conduct an investigation into the facts of the sale which might have led to an evaluation of the sale's materiality. Based on these undisputed facts, the district court determined that Price and Brody had notice that specific information existed which may have been material to the patentability of the application filed on behalf of Brasseler, but, in contravention to *FMC Corp. v. Hennessy Industries, Inc.*, 836 F.2d 521, 5 USPQ2d 1272 (Fed.Cir.1987) ("*Hennessy* "), chose not to investigate the facts necessary to determine the materiality of the event in an effort to avoid complying with their duty to disclose.

In *Hennessy*, we explained that a duty to investigate does not arise where there is no notice of the existence of material information. *Id.* at 526 n. 6, 5 USPQ2d at 1275 n. 6. The mere possibility that material information may exist will not suffice to give rise to a duty to inquire; sufficient information must be presented to the attorney to suggest the existence of specific information the materiality of which may be ascertained with reasonable inquiry. Indeed, a finding of deceptive intent may not be based solely on gross negligence, including instances in which the patent attorney is completely unaware of the existence of specific information later discovered and found to be material.[3] The district court in this case noted that gross negligence by the attorneys would be insufficient to support a finding of intent to deceive. 93 F.Supp.2d at 1259. Thus mindful of the correct law, the district court nonetheless determined that the attorneys' conduct surpassed gross negligence. We cannot find error in that determination.

■ There is no need for an attorney to pursue a fishing expedition to obtain information. Counsel can reasonably rely

---

**3.** *Kingsdown*, 863 F.2d at 876, 9 USPQ2d at 1392 (*en banc* in relevant part) ("We adopt the view that a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.");

*Nordberg*, 82 F.3d at 397, 38 USPQ2d at 1595 (upholding the district court's decision that patentees did not engage in inequitable conduct based solely on the district court's finding that the patentees were unaware of the prior art during prosecution of the patent application, even though a copy of the prior art patent was in the company's files).

on information provided by the client,[4] unless, as here, there is reason to question the accuracy or completeness of the information or to doubt the adequacy of the client's own investigation into material facts. Thus, no duty to inquire arises unless counsel is on notice of the likelihood that specific, relevant, material information exists and should be disclosed. Here, Price and Brody were aware that sales of the invention had been made approximately one year before the filing of the application and, in light of the questionable information given to them by "someone at Brasseler," *id.* at 1263, they had a duty to investigate.

 Implied notice of a fact is defined in *Black's Law Dictionary*, as "[n]otice that is inferred from facts that a person had a means of knowing and that is thus imputed to that person; actual notice of facts or circumstances that, if properly followed up, would have led to a knowledge of the particular fact in question." *Black's Law Dictionary* 1088 (7th ed.1999). Thus, notice of a possibly material event—a sale, public use, publication, issuance of a patent,[5] occurring on or about one year before the application is filed—arises when information of which the attorney is aware suggests the existence of specific information that may be material.

In *Hennessy*, we warned that "one should not be able to cultivate ignorance, or disregard numerous warnings that material information or prior art may exist, merely to avoid actual knowledge of that information or prior art." 836 F.2d at 526 n. 6, 5 USPQ2d at 1275 n. 6. Where one does, deceptive intent may be inferred. *Id.* Once an attorney, or an applicant, has notice that information exists that appears material and questionable, that person cannot ignore that notice in an effort to avoid his or her duty to disclose.[6] *Id.* Similarly, in *Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 25 USPQ2d 1561 (Fed.Cir. 1993), we explained that absent credible evidence of good faith, evidence of a knowing failure to disclose sales that "bear all the earmarks of commercialization reasonably supports an inference that the inventor's attorney intended to mislead the PTO." 984 F.2d at 1193, 25 USPQ2d at 1570.

Based on the undisputed facts, the court found that Price and Brody's "studied refusal to timely investigate" and disclose material information, under a continuing duty to disclose, established that Price and Brody acted with deceptive intent. We see no error in the district court's determination.

In this case, Brody was deposed on November 18, 1997. He offered conflicting testimony regarding who charged him with the task of filing the application. First, he

---

4. In the Manual of Patent Examining Procedure ("MPEP") section 2004, styled "Aids to Compliance With Duty of Disclosure," the PTO sets forth a list of recommended procedures that attorneys should follow in order to shield themselves from accusations that they failed to comply with their duty to disclose, including recommendations that they and their clients fill out checklists, or questionnaires, to ensure that the applicant has been informed of the duty of disclosure. This involves asking the inventors and assignees questions regarding: the origin of the invention, possible pre-filing sales and public uses,

relevant publications, patents .... etc. MPEP 2000–7.

5. Given the limited number of events, the notice requirement that triggers this duty, and in light of the clear guidance on this issue offered by the PTO, we hardly find burdensome the actions required to comply with this duty.

6. Individuals associated with the filing or prosecution of an application have a duty to disclose material information commensurate with their involvement. 37 C.F.R. § 1.56(c).

stated that "Bob Price told me to file the case by April 30th." Then, moments later, when asked, "And did you rely solely upon Bob Price as to the potential bar date . . . ?" he replied, "Well, really, I relied on the client . . . [who told me to f]ile the case by April 30th." If the latter statement is in fact accurate, that indicates that the inventor, who was clearly aware of the sale, instructed Brody to hurriedly file the application. Putting that fact aside, in addition to the obvious conflict between those two statements, pertaining to the most critical issue in this case, Brody's assertion that the inventors directed him to file the application is in direct conflict with testimony that Price had instructed him to file the application as provided in an affidavit Brody executed on October 28, 1999, just weeks earlier. Thus, the district court correctly found that Brody's responses lacked candor, stating that "[h]e tiptoes around" the truth. As previously noted, a district court's credibility determinations are to be reviewed deferentially. *Monon*, 239 F.3d at 1263–64, 57 USPQ2d at 1707. In light of the fact that Brody contradicted his own testimony in response to questions surrounding who instructed him to file the application by April 30, 1992, with great skepticism the court noted that he claimed not to know what the event was that presumably gave rise to a bar, questioned why he did not know the exact date the potential bar event took place, and noted that he could not recall whether he queried the inventors of such facts in the course of the conversations he had with them.

Accordingly, the court found Price and Brody's refusal to investigate the facts surrounding the bar, of which they apparently knew so little, underscored the "studied ignorance that [they] carefully cultivated" and with which Brody prosecuted the application. The court described the "high-spun wordplay" Brody employed in the course of this litigation in an attempt to diminish the implications arising from his conduct. In fact, Brody denied ever learning of any specific sales that took place until reading this court's opinion in *Brasseler II*. Rather than producing evidence that Price and Brody acted in good faith, we further note that Brasseler claimed attorney-client privilege to protect documents in the prosecution file generated by Brody in the course of prosecuting the application, and, similarly, that Brasseler offered no testimony from Price regarding the circumstances that precipitated the unusually rushed filing of Brasseler's patent application. Significantly, in testimony found in the text of his affidavit, Brody acknowledged that had he had notice of material information, he would have had a duty to investigate and disclose such information. It is, therefore, not surprising that the district court was unable to point to any credible evidence upon which it could reasonably infer that Price and Brody acted in good faith.

On the basis of the evasive testimony of Brody, the suspicious circumstances surrounding the rush filing of the application, the interactions between the inventors and their attorneys, and the absence of testimony from supervisory attorney Price or of any evidence to suggest that the failure to investigate the details surrounding the bar event was not committed in bad faith,[7] we agree with the district court that Brasseler has failed to produce evidence supporting a reasonable inference that the two acted in good faith. Thus, we conclude that the undisputed evidence is consistent

---

7. *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1400 n. 9, 230 USPQ 849, 855 n. 9 (Fed.Cir.1986) ("When a party knows of witnesses on a material issue and they are within his control to produce, if the party chooses to not call the witnesses, the fact finder may draw the inference that the testimony would have been unfavorable.").

with the court's finding that Price and Brody had notice that a potentially invalidating event took place, and that they willfully ignored such notice in an conscious effort to avoid complying with their duty to disclose. As previously noted, this is not an issue of a wrong judgment being made by the attorneys; it is an issue of failing to inquire when they were on notice of certain factual issues which may have been material to the prosecution of the patent application and had notice that a potential on-sale bar problem existed. Attorneys must conduct meaningful inquiries when the surrounding factual circumstances would cause a reasonable attorney to understand that relevant and questionable material information should be assessed.

*The Conduct of the Inventors*

■ In addition, the district court determined that the inventors either knew or should have known of the materiality of the sale, and that the inventors possessed the requisite intent to deceive the PTO. There can be no doubt that the inventors knew that the April 13, 1992 transaction had taken place. The court correctly concluded that the inventors knew that the sale was material. First, knowledge of the law is chargeable to the inventor. *Molins,* 48 F.3d at 1178, 33 USPQ2d at 1826 (citing *FMC Corp. v. Manitowoc Co.,* 835 F.2d at 1415 n. 8, 5 USPQ2d at 1115 n. 8 (Fed.Cir. 1987) for the proposition that "the knowledge and actions of an applicant's representative are chargeable to the applicant"). Based on Brody's testimony that the application was filed with urgency to avoid what the inventors perceived to be a potential bar, Brasseler cannot dispute that the inventors clearly understood the concept of an on-sale bar. Second, in both the appli-

cation oath and a declaration filed to overcome a prior art rejection, citing 37 C.F.R. § 1.56(a), the inventors twice attested to understanding the duty to disclose on-sale bars and other material information. Moreover, the extremely large quantity of blades sold in the April 13, 1992 transaction should have given every indication that the sale would likely be found an invalidating sale.

■ We are not persuaded that Brasseler reasonably believed that the sale was not material because it believed that sales between inventors could not raise a bar to patentability. We reiterate that inventors represented by counsel are presumed to know the law. Commercial transactions between two unrelated corporations are clearly the type of sales contemplated by the statute. *In re Caveney,* 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985). Moreover, Brasseler's failure to disclose the sale on the basis that it relied on a "joint development" exception is belied by the fact that it was clear at the time that no such exception to the on-sale bar rule exists.[8] *Buildex. Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1465, 7 USPQ2d 1325, 1328 (Fed.Cir.1988). Brasseler further argues that under the "totality of the circumstances" test, in effect throughout prosecution of the application, it had a good faith belief that it was not required to disclose the sale to the PTO. Brasseler maintains that its failure to disclose was reasonable given the uncertainty surrounding the application of that test at the time the patent application was pending. Rejecting both contentions, the district court concluded that the materiality of the sale was readily apparent under either standard.

8. We find it odd indeed that Brasseler asks this court not to attribute to it knowledge of the law, yet argues that it withheld disclosure in reasonable reliance of that law which it claims not to have known.

While the Supreme Court's opinion in *Pfaff* redefined the test for determining conduct which gives rise to an on-sale bar under 35 U.S.C. § 102(b), 525 U.S. at 65–67, 119 S.Ct. 304, we agree with the district court's conclusion that the materiality of the sale would have been readily apparent under either test. Principally, we note that the transaction involved the sale of over 3,250 of the patented blades. This sizable transaction took place between two unrelated corporations and was not the subject of any exception to the on-sale bar rule. Moreover, we have repeatedly warned practitioners that in close cases, where the materiality of the information is uncertain, disclosure is required. *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d at 1076, 22 USPQ2d at 1033.

Accordingly, the district court properly rejected Brasseler's argument that it reasonably believed the sale could not raise a bar under 35 U.S.C. § 102(b).

*Allocation of Attorney Fees*

Brasseler argues that the district court should have parsed out the charges for fees incurred in the presentation of the on-sale bar defense, from all other fees Stryker incurred in defense of this lawsuit. We cannot agree. Stryker would not have incurred any of the fees generated in defense of this suit had Brasseler not committed inequitable conduct in pursuit of its patent and had it not filed a claim for infringement of that patent, known by Brasseler to have been improperly obtained. Thus, Brasseler should be charged with the expense of defending against this frivolous lawsuit. Furthermore, the district court's failure to reach the remaining defenses raised by Stryker, because they were mooted by its inequitable conduct finding, cannot be a basis for denying fees relating to those defenses. *Mathis v. Spears*, 857 F.2d 749, 755, 8 USPQ2d 1551, 1555 (Fed.Cir.1988). Accordingly, we cannot agree to reduce the grant of fees.

### CONCLUSION

The district court did not clearly err in reaching findings that the inventors and their representatives knowingly withheld material information with deceptive intent. The court's decision to award attorney fees in accordance with 35 U.S.C. § 285 was not an abuse of discretion in this exceptional case. Accordingly, the judgment of the district court is

*AFFIRMED.*

### COSTS

No costs.